Basic Refractories, Incorporated v. Commissioner. Kennedy Refractories Company v. Commissioner. Non-Metallic Minerals, Inc. v. Commissioner.
Basic Refractories, Inc. v. Commissioner
Docket Nos. 30471-30474.
United States Tax Court
1953 Tax Ct. Memo LEXIS 222; 12 T.C.M. (CCH) 649; T.C.M. (RIA) 53201; June 8, 1953
I. W. Sharp, Esq., 630 Bulkley Building, Cleveland, Ohio, and R. G. Hengst, Esq., for the petitioners. Clarence Price, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Docket No. 30471 involves redetermination of respondent's determination of a deficiency in income tax, declared value excess profits tax and excess profits tax of Basic Refractories, Incorporated, for years and in amounts, as follows: Declared Value
Income Tax
Excess Profits
Excess Profits
Year
Deficiency
Tax Deficiency
Tax Deficiency
1940
$94,892.00
$4,250.06
$58,562.12
1941
43,537.93
1942
52,126.92
4,882.45
Dockets numbered 30472, 30473 and 30474 involve a redetermination of a deficiency in income tax of Basic Refractories, Incorporated, and its *223 wholly owned subsidiaries, Kennedy Refractories Company and Non-Metallic Minerals, Incorporated, for years and in amounts, as follows: Year
Deficiency
1943
$30,410.89
1944
25,498.81
1945
36,207.01
The subsidiaries, the petitioners in dockets numbered 30473 and 30474, respectively, are parties herein solely by reason of their having filed consolidated returns with their parent, Basic Refractories, Incorporated, for the years 1943, 1944 and 1945. The petitions so filed by the subsidiaries raise no independent issues with respect to the income or deductions therefrom. All issues raised by the petitions in dockets numbered 30472, 30473 and 30474 have been resolved by agreement of the parties upon the basis of adjustments set forth in the stipulation of facts filed herein. Several of the issues raised by the petition upon which the proceeding docketed at No. 30471 is based have also been resolved by stipulation of the parties. At the hearing, the respondent conceded error with respect to his failure to deduct dividends received credit from net income in determining surtax net income in his computation of the surtax for the year 1941. The stipulation of facts filed *224 by the parties provides that in the event it be determined that the interest received by Basic Refractories, Incorporated, in 1942, on income tax overassessments, constituted abnormal income and that the recipient thereof is entitled to relief under section 721 of the Internal Revenue Code, the amount of net abnormal income attributable to previous taxable years shall be determined under Rule 50. Respondent now concedes, on brief, that, under the facts as stipulated herein, the interest received by Basic Refractories, Incorporated, in 1942 on its refund of prior years taxes constituted abnormal income and that the recipient is entitled to the relief provided in section 721, supra. The issues remaining in dispute in docket No. 30471 involve: (1) A determination by us of the amount of deductible loss sustained by Basic Refractories, Incorporated, upon the sale of its land at Peebles, Ohio; (2) A determination by us as to the amount of taxable gain realized or deductible loss sustained by Basic Refractories, Incorporated, upon the sale of its plant and properties other than land located at Peebles, Ohio; and (3) Whether Basic Refractories, Incorporated, *225 is entitled to a deduction in any amount for depreciation of its Peebles plant for the taxable year 1940. Findings of Fact The facts stipulated by the parties are so found and made a part hereof. Petitioner Basic Refractories, Incorporated (hereinafter sometimes referred to as petitioner), is a corporation incorporated under the laws of the State of Ohio on May 29, 1931, under the name of Basic Dolomite Incorporated, which name was changed to Basic Refractories, Incorporated, on April 1, 1941. Petitioner Kennedy Refractories Company (hereinafter called Kennedy) was incorporated under the laws of the State of Pennsylvania on November 15, 1915. Kennedy was dissolved on October 30, 1950. Petitioner Non-Metallic Minerals, Incorporated (hereinafter referred to as Non-Metallic), is a corporation organized under the laws of the State of Ohio on August 20, 1932. At all times here relevant, Kennedy and Non-Metallic were the wholly owned subsidiaries of petitioner. The books of account of the petitioner, Kennedy and Non-Metallic were kept and their income and excess profits tax returns were prepared and filed on an accrual basis. The principal business and accounting offices of the petitioner, *226 Kennedy and Non-Metallic are, and have been at all times here relevant, located in Cleveland, Ohio. The petitioner filed its income and declared value excess profits tax returns and its excess profits tax returns for the calendar years 1940, 1941 and 1942 with the collector of internal revenue for the eighteenth district of Ohio at Cleveland. The petitioner, Kennedy and Non-Metallic filed consolidated income and excess profits tax returns for the calendar years 1943, 1944, and 1945 with the collector of internal revenue for the eighteenth district of Ohio at Cleveland. Petitioner was organized in 1931 with a total outstanding stock authorization of 10,000 shares of 7 per cent cumulative preferred with a par value of $100 per share and of 50,000 shares of no par value common stock. The organization was effected pursuant to an agreement dated May 29, 1931, between Dolomite, Incorporated (hereinafter called Dolomite), and Basic Products Company (hereinafter called Basic). This agreement provided for various transactions that were consummated as of June 1, 1931. In accordance therewith, Dolomite, through its wholly owned subsidiary, Dolomite Properties, Incorporated, conveyed all *227 of its refractory business and substantially all of its plant properties, subject to a funded indebtedness in the amount of $1,100,000, inventories and intangibles pertaining to such refractory business, to petitioner in exchange for $722.19 in cash, the assumption of the foregoing funded indebtedness and 7,500 of the taxpayer's 7 per cent cumulative preferred shares of a par value of $100 each. Basic conveyed to petitioner all of its refractory business and certain of its properties, inventories and intangibles pertaining thereto, together with all the outstanding capital stock of Kennedy, in exchange for 2,500 of petitioner's 7 per cent cumulative preferred shares of the par value of $100 each and $250,000 principal amount of the petitioner's First and General Mortgage 6 per cent Sinking Fund Gold Bonds. In addition, petitioner assumed a certain lease agreement between Kennedy as lessor and Basic as lessee. Pursuant to the agreement, 32,500 shares of petitioner's no par common stock were issued to Dolomite, in exchange for $16,250.66 in cash and customers' accounts receivable thereof aggregating $64,999.34, or a total of $81,250. The remaining 17,500 shares of petitioner's no par *228 common stock were subscribed for by and were issued to G. S. Davison, President of Basic, for $8,819.60 in cash and $34,930.40 in customers' accounts receivable of Basic, or a total of $43,750. These transactions involving the issuance of petitioner's common shares and the consideration therefor were reflected in petitioner's books of account as follows: "June 1, 1931 Entry"
"Cash - Central United Nat'l
Bank
$25,070.26
Accounts Receivable - Trade
99,929.74
To Dolomite, Inc.
$81,250.00
Basic Products, Inc.
43,750.00"
"This is to record the receipt of cash as above, and the assignment to this company of accounts receivable, as per lists filed herewith, all in payment for Common Shares subscribed to by Dolomite, Inc. and Basic Products Co., as per formal subscriptions on file, which please see." "June 1, 1931 Entry"
"Dolomite, Inc.
$81,250.00
Basic Products Co.
43,750.00
To Common Capital Stock
$125,000.00"
"This is to record the issuance of 32,500 Common Shares to Dolomite, Inc. and 17,500 Common Shares to the Basic Products Co. at $2.50 per share in payment for the cash and accounts receivable referred to in the foregoing *229 entry, all pursuant to the Stock Subscriptions on file." The foregoing transactions did not constitute a tax free exchange or tax free exchanges and the basis of the properties so acquired by petitioner was the cost thereof rather than the transferor's basis. The land and stone deposits acquired in 1931 by the petitioner from Basic Products Company included approximately 614 acres near Peebles in Adams County, about 25 miles northwest of Portsmouth, Ohio. The property had access by private switch track to the Norfolk and Western Railroad. The petitioner sold the land and all other property at Peebles not previously disposed of for $37,500 on December 30, 1940, to Southern Ohio Quarries Company (hereinafter called Southern). There are no issues with respect to the petitioner's cost basis for the repair parts inventory or the dispositions made prior to the sale to Southern. Depreciation upon the Peebles property was claimed by the petitioner and allowed by the Commissioner at the rate of $10,200 annually in the aggregate amount of $87,246.91 for the period from June 1, 1931 to December 31, 1939. Depreciation upon the Peebles property in the amount of $10,200 for the year 1940 was *230 claimed by the petitioner and was disallowed by the Commissioner. The petitioner did not operate the Peebles property from the date of acquisition, June 1, 1931, until 1940. The petitioner sold 479 tons of agricultural limestone from the Peebles property to the United States Department of Agriculture during 1940. In connection with this sale only the side track and access roads of the Peebles property were used or operated. During the period from the date of acquisition until the sale of the Peebles property on December 30, 1940, the petitioner received $1,828.92 as rentals for use of the Peebles land and houses thereon, and paid $341.18 as expense in connection with such rented properties. In addition, during the period from March 1, 1937, to December 30, 1940, the petitioner allowed an individual, who acted as watchman at the Peebles plant, free use of a farm and two houses as compensation for his services. The aggregate of petitioner's expenses other than depreciation and the aforementioned $341.18, in connection with the Peebles property for the period from June 1, 1931, to December 30, 1940, were as follows: Petty Cash
Total
Property
Salaries
Miscellaneous
Cash
Taxes
Insurance
& Wages
Repairs
Expense
Expenses
$16,098.07
$967.87
$3,161.50
$677.46
$59.24
$20,964.14
*231 Prior to the formation of petitioner, Basic had acquired all of the stock of Kennedy on February 3, 1931, without paying any consideration therefor beyond entering into a lease on January 15, 1931, wherein Basic agreed to pay rental upon the leased assets (carried on the books of Kennedy at $345,415.44) in the total amount of $600,000 in quarterly installments of $15,000 each. Kennedy's interest in the lease, as lessor, including the right to receive rent, was assigned to Kennedy Securities Company. Basic's interest as lessee, including the obligation to pay the rental of $600,000, was assigned, and assumed by the petitioner in accordance with the above described agreement pertaining to the transfers as of June 1, 1931. The petitioner and its predecessors at all times here material have been engaged in the business of producing granular basic refractories, principal of which is dead-burned dolomite, a limestone consisting of approximately 45 per cent magnesium carbonate and 55 per cent calcium carbonate. This product is used primarily in the maintenance of furnaces used in the manufacture of steel by the basic process. Petitioner also has been a producer of crushed stone for railroad *232 ballast, blast furnace flux and raw open hearth refractory. The location of plants which produced dead-burned dolomite is determined by the existence at that point of limestone deposits containing the requisite proportions of magnesium and calcium. In preparing and processing dead-burned dolomite for industrial use as a basic refractory, the dolomite is quarried by open pit methods, crushed and sized to small granules, and screened for fine particles. The granules are then introduced, with certain fluxes, into a rotary kiln where it is heated to high temperatures causing the dolomite granules in the rotating cylinder to become somewhat heavier and denser by the absorption of the fluxes and by the loss of carbon dioxide. The granules are then cooled, culled for lumps, coated with a protective material and sized. The resulting product is shipped as dead-burned dolomite in bulk to the steel furnaces. The American steel industry prior to 1914 relied upon dead-burned magnesite imported from Austria and domestic unprocessed dolomite for both basic hearth construction and lining maintenance refractories. Due to wartime shortages, the manufacture of dolomite into a scientifically prepared *233 refractory was begun by three companies, the business of which was consolidated at a later time to form Basic Refractories, Incorporated, the petitioner herein. Of the three companies, Dolomite, Kennedy, and Basic Products, the latter was the first so to commence production of dolomite refractory during the first world war. In 1931 all dead-burned dolomite was sold "f.o.b. works", that is at prices fixed as of the point of production. Production of dead-burned dolomite in Ohio in 1931 existed in the Maple Grove-Woodsville area in Northwestern Ohio where there were plants operated by Dolomite, Kennedy and Standard Lime & Stone Company, and in the southern Ohio area where Basic produced crushed rock at the Peebles property and burned the rock in kilns at Kenova, West Virginia. Had there been a plant for producing dead-burned dolomite located at Peebles in 1931, it would have captured the Cincinnati market, where there were four important steel plants at Portsmouth, Ashland, Newport and Middletown, because of its freight advantage into that market. Clinkered dolomite from such a plant would also have entered the St. Louis market and the Birmingham market at transportation advantages *234 over any then existing competitive production. Dead-burned dolomite from a plant at Peebles would have gained access to the Pittsburgh market at an equal transportation cost with any other area in which dead-burned dolomite was produced at that time. In the light of the then prevailing practice, the Peebles plant location was a desirable one for the petitioner. The Maple Grove area has transportation advantages in respect to the Cleveland-Youngstown, Chicago, Detroit and Buffalo steel producing areas. The Pittsburgh area, in 1931, led the industry in the quantity of steel produced and was the biggest market for dead-burned dolomite. Steel production in the southern area was also substantially less than that in the Cleveland-Youngstown area. In the summer of 1930, negotiations had been had between Dolomite and Kennedy regarding possible consolidation of the operations of the two companies. The parties thereto could not come to terms and the merger failed to materialize, the governing factor being that the Kennedy facilities, consisting of a quarry, a crushing and screening plant, and a clinkering plant, were a duplication of Dolomite's nearby Maple Grove facilities. In the spring *235 of 1931, negotiations were commenced to consolidate the refractories business of Basic and Dolomite. Basic had its kiln for clinkering operations at Kenova, West Virginia, a distance of 85 miles from its quarry and crushing plant near Peebles, which resulted in an uneconomic production of clinkered dolomite. The Kenova plant was not acquired by petitioner. The Kennedy quarry, crushing plant and kiln which were available for use by petitioner after June 1, 1931, were immediately adjacent to one another at Bettsville, Ohio, a short distance from Dolomite's Maple Grove operation. Such facilities were a duplication of those of Dolomite. Immediately after the petitioner was organized, the Kennedy quarry was allowed to fill up with water and the crushing plant was removed and sold. The Kennedy clinkering plant and the Peebles quarry and crushing plant were kept in a standby position. The contemplated removal of the Kennedy facilities to Peebles was not effected following formation of petitioner. Petitioner's Maple Grove operation was central to the steel industry as a whole. It had the advantage of being about 35 miles from the geographical center of the steel industry. On the other hand, *236 the Peebles operation was nearer the coal fields and coal is the greatest single item of cost in the production of dead-burned dolomite. Labor rates were lower in the Peebles area than in the Maple Grove area. The Peebles plant had the possibility of access to water transportation on the river. It had a fine ore deposit. It had a sound plant and needed only a kiln to make it a complete operation. An analysis of the ore deposits at Peebles revealed three strata of stone, two characterized as "Niagara", which is the same type of ore as mined at the northwestern Ohio quarries, and the other as "Monroe". From a metallurgical standpoint in respect to the clinkered dolomite business, the deposits at Peebles were entirely comparable to those in northwest Ohio. The date on which the merger forming the petitioner was effected, June 1, 1931, and the years immediately ensuing were during the depths of the depression when steel production was low and when there was not a market for any one of the two plants. Eventually, it was decided to expand the facilities at Maple Grove and concentrate production there rather than to decentralize production and develop Peebles for clinkering. Petitioner's *237 production was confined to its Maple Grove plant. The Peebles plant was never activated and in 1940 was sold. There has been no producer of dead-burned dolomite in the southern Ohio area since 1931, the nearest thereto being in northwestern Ohio. To the present date, northwestern Ohio remains the principal area in the United States for the production of dead-burned dolomite. The Peebles property which was acquired by petitioner from Basic consisted of 614 acres of land and stone deposits, quarry development on this property, tracks laid to the quarrying areas, mining machinery, mine cars, crushers, elevator screens, bins, a drier for the stone, yard tracks, a quarry plant office, eleven dwellings, a machine shop, and a crusher building several stories in height, electrical equipment, piles of agricultural limestone and an inventory of repair parts and supplies. This property was taken on the books of petitioner at an aggregate book value based upon its cost in terms of the part or face value of the securities issued therefor. There was no segregation of the several items so acquired and no individual appraisal of the assets was made at that time. The minutes of the petitioner *238 dated March 31, 1937 read as follows: "The president stated to the meeting that it was the opinion of the officers that the Peebles property of this corporation was carried on its books of the corporation at the present time at a figure which probably exceeded a conservative valuation of said property under present conditions, and that the officers of the corporation were prepared to recommend that a reserve of $221,128.24 be set up on the books of the corporation for revaluation of said property." The recommendation of the officers of the petitioner to set up the foregoing reserve on its books to reflect the write-down of the value of the Peebles property was adopted and accomplished by the petitioner. In so reflecting the reduction of the Peebles property value on the petitioner's books, Note D of an Ernst and Ernst report dated July 23, 1937, relating to the petitioner as of the period ending June 30, 1937, states as follows: "This property has not been operated since it was acquired by the company, and it is not known to what extent, if any, it will be operated in the future." In 1936, representatives of the American Appraisal Company (hereinafter called American) made *239 an appraisal of the depreciable Peebles property exclusive of dwellings, as of July 1, 1936. Then in 1941, a representative of American other than those who made the 1936 appraisal, went to Peebles for the purpose of making an inspection of the property five years after the event of the 1936 appraisal, to look at the land and deposit and to look at the stockpile of agricultural limestone in order to adjust such appraisal back to 1931. No detailed formal report on the 1941 inspection was ever prepared or adopted. A few months before the hearing herein a retrospective appraisal of the entire Peebles property as of June 1, 1931, was made by American. This retrospective appraisal, so far as it related to the Peebles plant and property, exclusive of land deposits, stockpile of agricultural limestone and crushed rock, and 11 dwelling houses, was computed by adjusting the 1936 appraisal figures to allow for prior changes between June 1, 1931, and July 1, 1936. Such adjustments were done by the Pricing Department of American. The retrospective appraisal so far as it related to the remainder of the Peebles property, exclusive of the 11 dwelling houses, was based upon the personal observations, *240 estimations and computations of the representative of American who went to Peebles in 1941. The records of Southern indicate that in 1941 there were 60,119 tons of agricultural limestone in the stockpiles at Peebles. For the purposes of real estate taxes, the 11 dwelling houses at Peebles were, in 1932, valued and assessed at a total of $3,950. The total of such assessments for both the land and buildings, exclusive of personal property and equipment, was $106,500. In his final determination the respondent allocated the selling price of $37,500 as between land and other property, according to the ratio of costs claimed by the petitioner, and applied the same to the adjusted basis on the date of sale, as follows: Unrecovered
Selling
Cost 12/30/40
Price
Taxable Gain
Land
$17,230.00
$ 8,846.25
($ 8,383.75)
Other Property
8,770.01
28,653.75
19,883.74
Based upon the foregoing and all the evidence of record, we find as ultimate facts that: The value of the Peebles land at the time of its acquisition by petitioner from Basic Products Company on June 1, 1931, was in the amount of $43,000. The value of the Peebles property other than land at *241 the time of its acquisition by petitioner from Basic Products Company on June 1, 1931, was in the amount of $256,768. Opinion VAN FOSSAN, Judge: The parties have settled by stipulation or concession all questions herein involved with the exception of the valuation of two items of property and an item of depreciation. As to the questions of values submitted for our judgment, we have noted our conclusions in the findings of fact. The values found will be employed in the Rule 50 recomputation consequent hereon. The item of depreciation must be disallowed for failure of proof. The burden of proving respondent to be in error rested on petitioner. The evidence submitted is not sufficient to establish or support a conclusion that respondent erred. Decisions will be entered under Rule 50.